**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

STATE OF FLORIDA,

    *Plaintiff*,

    v.                              Case No. 3:21-cv-2722

DEPARTMENT OF HEALTH AND
HUMAN SERVICES; XAVIER
BECERRA, in his official capacity as
Secretary of the Department of Health
and Human Services; The UNITED
STATES OF AMERICA; CHIQUITA
BROOKS-LASURE, in her official
capacity as Administrator of the Centers
for Medicare and Medicaid; THE
CENTERS FOR MEDICARE AND
MEDICAID,

    *Defendants*.

_____/

**COMPLAINT FOR TEMPORARY RESTRAINING**
**ORDER, PRELIMINARY AND PERMANENT**
**INJUNCTIVE RELIEF, AND DECLARATORY RELIEF**

**INTRODUCTION**

1.    Many American workers were able to stay home at the peak of the

pandemic. But our healthcare workers were on the front lines, risking their lives to

keep us safe. Working conditions were tough, exacerbating an already worsening

staffing shortage.

2.    While these same workers continue to bravely discharge their duties, President Biden is now telling over 10 million of them that they must get vaccinated or lose their jobs. In his words, any resistance to this mandate—even by those with natural immunity—is claiming the "freedom to kill [others] with [their] COVID."[1]

3.    This action is unprecedented. As the federal government concedes, it has "not previously required" mandatory vaccination for the healthcare industry. *See Medicare and Medicaid Programs: Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61,555 (Nov. 5, 2021) (the mandate). In fact, the federal government has "not previously required" mandatory vaccination for *any* private industry. Just months ago, the Biden Administration made clear that mandating vaccines is "not the role of the federal government."[2]

4.    It is also reckless. The healthcare industry is in the throes of what "some are calling the worst U.S. health-care labor crisis in memory."[3] Indeed, pandemic-related burnout has created critical staffing shortages nationwide. Compounding the problem, many healthcare employees do not want to take the COVID-19 vaccine, particularly in small, rural areas already short on personnel. Combined, these factors

---

[1] *CNN Presidential Town Hall With President Joe Biden*, CNN (Oct. 21, 2021), https://transcripts.cnn.com/show/se/date/2021-10-21/segment/01.

[2] *Press Briefing by Press Secretary Jen Psaki, July 23, 2021*, The White House (July 23, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

[3] Carey Goldberg & Jonathan Levin, *Vaccine Mandates Hit Amid Historic Health-Care Staff Shortage*, Bloomberg (Oct. 2, 2021), https://www.bloomberg.com/news/articles/2021-10-02/vaccine-mandates-hit-amid-historic-health-care-staff-shortage.

have created a powder keg, and healthcare officials fear a vaccine mandate could spark an exodus of workers from the industry. Given these severe conditions, even a minor loss of staff could have a "disastrous impact" on patient care.[4]

5.   Against this backdrop, the federal government previously determined that less-intrusive safety regulations were appropriate to combat the spread of COVID-19 in healthcare facilities. *E.g.*, Medicare and Medicaid Programs; COVID-19 Vaccine Requirements for Long-Term Care (LTC) Facilities and Intermediate Care Facilities for Individuals With Intellectual Disabilities (ICFs-IID) Residents, Clients, and Staff, 86 Fed. Reg. 26,306 (May 13, 2021); Occupational Exposure to COVID-19; Emergency Temporary Standard, 86 Fed. Reg. 32,376 (June 21, 2021).

6.   But as healthcare workers grappled with the deeply personal decision of whether to take a vaccine, President Biden's "patience . . .w[ore] thin," and he grew "ang[ry] at those who haven't gotten vaccinated."[5] Unwilling to wait any longer, on September 9, 2021, President Biden announced several administrative actions aimed at mandating vaccines, which together affect roughly 100 million Americans.[6]

---

[4] *Health care group worried vaccine mandate will impact Missouri nursing homes*, Fox 2 Now (Nov. 5, 2021), https://fox2now.com/news/health-care-group-worried-vaccine-mandate-will-impact-missouri-nursing-homes/.
[5] *Remarks by President Biden on Fighting the COVID-19 Pandemic*, The White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.
[6] *Id.*

7.     As relevant here, he announced that the Department of Health & Human Services (HHS) would issue a rule requiring vaccination for all employees working in Medicare- or Medicaid-participating facilities.[7] On November 5, 2021, the Centers for Medicare and Medicaid (CMS), an HHS component, did so. *See* 86 Fed. Reg. at 61,555.

8.     In its effort to fast-track the President's agenda, however, CMS exceeded its statutory authority and flouted key procedural safeguards that Congress enacted to protect the public from hasty and reactive decision-making.

9.     To start, CMS lacks the power to issue an industry-wide vaccination mandate. The statutes it relies on do not provide it such sweeping authority. In fact, CMS is forbidden from exerting this level of control over the healthcare industry. *See* 42 U.S.C. § 1395.

10.    Lack of authority aside, CMS also failed to fulfill its statutory duty "to consult with appropriate State agencies" in developing the mandate, *see* 42 U.S.C. § 1395z—a grievous dereliction of duty given that CMS has never before mandated vaccination and thus lacks an understanding of how its mandate will affect the States.

11.    Making matters worse, CMS sidestepped the notice and comment process set out in the Administrative Procedure Act (APA). *See* 5 U.S.C. § 553. And

---

[7] *Biden-Harris Administration to Expand Vaccination Requirements for Health Care Settings*, CMS (Sept. 9, 2021), https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings.

4

though it claims "good cause" to do so, *see id.* § 553(b)(B), its primary justifications—the two-year-old COVID-19 pandemic and the Delta variant—do not satisfy the exceedingly high and exceptional "good cause" standard.

12.   On top of all this, CMS acted arbitrarily and capriciously in issuing the mandate. *See* 5 U.S.C. § 706(2)(A). It fails to adequately consider the viability of less-intrusive measures like testing, the harmful effects the mandate will have on the healthcare staffing crisis and vaccine-education efforts, the effects of natural immunity and new COVID-19 treatments, the reliance interests of healthcare employers and employees, and the incongruence between its vaccine requirement and its stated goal of protecting patients and staff. It also fails to connect the statistics driving its mandate with most of the facilities covered by it or to sufficiently justify its extreme departure from the federal government's prior practices.

13.   Finally, the mandate violates the Spending Clause—which requires that conditions on federal funds be unambiguous—by changing the terms of an agreement Florida has with the federal government midstream and without notice.

14.   Because CMS's rushed and unlawful mandate threatens to defund the State's medical facilities, bleed them of vital staff, hamper the quality of their medical care, and harm both Florida's economy and the health of its citizens, Florida seeks immediate relief from this Court.

## PARTIES

15.    Plaintiff State of Florida is a sovereign State and has the authority and responsibility to protect its public fisc and the health, safety, and welfare of its citizens. It is also the operator of medical-service providers that receive Medicare or Medicaid funding. And its health agency—the Agency for Health Care Administration (AHCA)—administers Florida's Medicaid plan and assists CMS in regulating facilities that participate in Medicare.

16.    Defendants are the United States, appointed officials of the United States government, and United States governmental agencies responsible for the issuance and implementation of the challenged administrative actions.

17.    Florida sues Defendant the United States of America under 5 U.S.C. §§ 702–703 and 28 U.S.C. § 1346.

18.    Defendant CMS issued the mandate and is a component of HHS.

19.    Defendant Chiquita Brooks-LaSure is the Administrator of CMS. She is sued in her official capacity.

20.    Defendant HHS oversees CMS.

21.    Defendant Xavier Becerra is the Secretary of HHS. He is sued in his official capacity.

## JURISDICTION AND VENUE

22.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, 1361 and 5 U.S.C. §§ 702–03.

23.    The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. §§ 1361, 2201–02, the Constitution, and the Court's equitable powers.

24.    Venue lies in this district pursuant to 28 U.S.C. § 1391(e)(1) because the State of Florida is a resident of every judicial district in its sovereign territory, including this judicial district (and division). *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).[8] And because medical facilities receive Medicare and Medicaid funding in this district and division, a substantial part of the events or omissions giving rise to Florida's claims occurred here.

## FACTUAL BACKGROUND

### The Medicare and Medicaid Schemes

25.    Medicare and Medicaid are federal programs that pay medical expenses for certain individuals.

---

[8] *Accord Alabama v. U.S. Army Corps of Eng'rs*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005); *see also Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892) (explaining that "the state government . . . resides at every point within the boundaries of the state").

26.     Medicare is an insurance program.[9] It provides health-insurance coverage to individuals who are at least 65-years-old and are entitled to monthly Social Security benefits, and to disabled individuals who meet certain requirements. 42 U.S.C. § 1395 *et seq.* CMS administers the program on behalf of the Secretary of HHS. *See Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 651 n.3 (2003).

27.     Medicaid is an assistance program.[10] It pays medical bills for low-income individuals. 42 U.S.C. § 1396 *et seq.* It is "the primary federal program for providing medical care to indigents at public expense." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 262 n.19 (1974). The program is administered jointly by the States and the federal government through a "contract[ual]" relationship. *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012). Federal funds are distributed to qualifying States, which administer their Medicaid programs pursuant to federal requirements.

28.     To be eligible to receive payments from either Medicare or Medicaid, participating medical-care providers must enter into agreements with the federal government or the administering State in which they agree to comply with federally imposed conditions of participation, coverage, or certification. *E.g.*, 42 U.S.C.

---

[9] *What is the difference between Medicare and Medicaid*, HHS, https://www.hhs.gov/answers/medicare-and-medicaid/what-is-the-difference-between-medicare-medicaid/index.html.
[10] *Id.*

§§ 1395cc(b)(2), 1396a(a)(33)(B). Some requirements are created by statute. *E.g.*, 42 U.S.C. § 1395x. Others are created by CMS regulations. *E.g.*, 42 C.F.R. part 482.

29.     To ensure compliance with these conditions, CMS contracts with state health agencies to "survey" participating medical-care providers. 42 U.S.C. §§ 1395aa(a), 1396a(a)(33)(B). Florida is no exception—AHCA surveys participating providers on behalf of CMS.

<u>Current State of the Healthcare Industry</u>

30.     The COVID-19 pandemic has placed tremendous strain on the nation's healthcare industry, creating perhaps the "worst U.S. health-care labor crisis in memory."[11] As of October 1, 2021, about 16% of U.S. hospitals had "critical staffing shortages."[12] In some places, as many as 25% of beds are going unfilled because the facilities lack adequate staffing.[13] And rural areas are bearing a disproportionate share of the burden, making up 60% of staffing shortages nationwide[14] despite serving less than 20% of the population.[15]

---

[11] Carey Goldberg & Jonathan Levin, *Vaccine Mandates Hit Amid Historic Health-Care Staff Shortage*, Bloomberg (Oct. 2, 2021), https://www.bloomberg.com/news/articles/2021-10-02/vaccine-mandates-hit-amid-historic-health-care-staff-shortage.

[12] *Id.*

[13] *Id.*

[14] Aallyah Wright, *Rural Hospitals Can't Find the Nurses They Need to Fight COVID*, Stateline (Sept. 1, 2021), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2021/09/01/rural-hospitals-cant-find-the-nurses-they-need-to-fight-covid.

[15] *Rural Report: Challenges Facing Rural Communities and the Roadmap to Ensure Local Access to High-quality, Affordable Care*, American Hospital Association at 2, https://www.aha.org/system/files/2019-02/rural-report-2019.pdf.

31.     A chief driver of the crisis is employee burnout, which has reached "epidemic proportions."[16] In one study, "[a]n overwhelming 55% of frontline-health care workers reported burnout (defined as mental and physical exhaustion from chronic workplace stress)."[17] Almost 30% have considered "leaving the medical field" altogether,[18] and over 500,000 have done so already.[19]

32.     Another driver is money. Drawn by lucrative salary raises—some approaching 800%—many healthcare workers have left in-house staffs for contract staffing agencies.[20] Depleted by these losses, healthcare providers have been forced to turn to these very agencies to fill their staffing gaps, paying "well above normal" for their services.[21] This staffing arms race has hit healthcare providers across the board,[22] but it has been especially difficult for small rural hospitals that cannot afford

---

[16]    Dharam Kaushik, *Medical burnout: Breaking bad*, AAMC (June 4, 2021), https://www.aamc.org/news-insights/medical-burnout-breaking-bad.

[17] *Id.*

[18] *Id.*

[19] Mallory Hackett, *Healthcare lost 17,500 jobs in September amid ongoing labor shortage*, Healthcare Finance (Oct. 11, 2021), https://www.healthcarefinancenews.com/news/healthcare-lost-17500-jobs-september-amid-ongoing-labor-shortage.

[20] Leticia Miranda, *Rural hospitals losing hundreds of staff to high-paid traveling nurse jobs*, NBC News (Sept. 15, 2021), https://www.nbcnews.com/business/business-news/rural-hospitals-losing-hundreds-staff-high-paid-traveling-nurse-jobs-n1279199.

[21] Bertha Coombs, *Regulations slow urgent hiring of doctors and nurses amid coronavirus outbreak, staffing firms say*, CNBC (Mar. 28, 2020), https://www.cnbc.com/2020/03/28/coronavirus-regulations-slow-hiring-of-doctors-and-nurses-staffing-firms-say.html.

[22] *Hospitals and Health Systems Face Unprecedented Financial Pressures Due to COVID-19*, American Hospital Association (May 2020), https://www.aha.org/guidesreports/2020-05-05-hospitals-and-health-systems-face-unprecedented-financial-pressures-due.

to pay inflated contract staffing rates or increase salaries to keep their employees in-house.[23]

33.     Florida has not been immune to this staffing emergency. For example, 92% of long term care facilities in Florida face a staffing crunch; for 75% of them, it is "the number one concern."[24] And Florida's vacancy rate for nurses is 11%—more than a full percentage point above the national average.[25]

34.     Compounding the staffing crisis, many healthcare workers, both nationally and in Florida, do not want to receive the COVID-19 vaccine. A nationwide survey found that 25% of nurses had personal concerns about taking the vaccine.[26] In Florida, data published just a few months ago found that between 40–50% of hospital employees had not been vaccinated.[27] And in rural areas—which

---

[23] Leticia Miranda, *Rural hospitals losing hundreds of staff to high-paid traveling nurse jobs* (Sept. 15, 2021), https://www.nbcnews.com/business/business-news/rural-hospitals-losing-hundreds-staff-high-paid-traveling-nurse-jobs-n1279199.

[24] Jake Stofan, *Health care industry asking Florida lawmakers to address chronic staffing shortages*, WFLA (Nov. 1, 2021), https://www.wfla.com/news/florida/health-care-industry-asking-florida-lawmakers-to-address-chronic-staffing-shortages/.

[25] *Id.*

[26] Christopher O'Donnell, *Tampa Bay hospitals push COVID vaccine – but won't mandate it for their workers*, Tampa Bay Times (Sept. 3, 2021), https://www.tampabay.com/news/health/2021/09/03/tampa-bay-hospitals-push-covid-shot-but-wont-mandate-it-for-their-workers/.

[27] Liz Crawford, *AHCA: 42% of Florida hospital workers weren't vaccinated, as of June 4*, WTSP (July 22, 2021), https://www.wtsp.com/article/news/health/coronavirus/vaccine/hospital-workers-not-vaccinated/67-9e842ff1-e5b0-4f1f-8f9f-ccfec865ccbf; David Bauerlein, *UF Health Jacksonville finding widespread vaccine hesitancy among its own staff*, Jacksonville.com (July 23, 2021), https://www.jacksonville.com/story/news/2021/07/23/uf-health-ceo-says-overcoming-vaccine-hesitancy-challenge-among-staff/8075987002/.

have the most "dire" staffing shortages of all[28]—the statistics are even bleaker. One study found that in 30% of rural hospitals nationwide, less than half of the staff have received a COVID-19 vaccine.[29]

35.    This confluence of factors has left many healthcare administrators worried that a vaccine mandate could push the industry over the edge. They fear "many employees [will] quit rather than comply"—a "huge concern" given current staffing deficiencies.[30] The concern is not merely speculative: In some places, triple-digit numbers of workers have resigned or been fired for refusing to take a vaccine.[31] One Florida-based administrator estimates that a mandate would cause him to "lose 10 to 15 percent of [his] staff."[32] But this estimate is on the low end: A recent survey found that 37% of unvaccinated workers would leave their jobs if their employers

---

[28] Aallyah Wright, *Rural Hospitals Can't Find the Nurses They Need to Fight COVID*, Stateline (Sept. 1, 2021), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2021/09/01/rural-hospitals-cant-find-the-nurses-they-need-to-fight-covid.

[29] Tamara Keith, *Why Lagging COVID Vaccine Rate At Rural Hospitals 'Needs To Be Fixed Now'*, NPR (May 4, 2021), https://www.npr.org/2021/05/04/993270974/why-lagging-covid-vaccine-rate-at-rural-hospitals-needs-to-be-fixed-now.

[30] Christopher O'Donnell, *Tampa Bay hospitals push COVID vaccine – but won't mandate it for their workers*, Tampa Bay Times (Sept. 3, 2021), https://www.tampabay.com/news/health/2021/09/03/tampa-bay-hospitals-push-covid-shot-but-wont-mandate-it-for-their-workers/.

[31] Dan Diamond, *153 people resigned or were fired from a Texas hospital system after refusing to get vaccinated*, The Washington Post (June 22, 2021), https://www.washingtonpost.com/health/2021/06/22/houston-methodist-loses-153-employees-vaccine-mandate/.

[32] Hannah Mitchell, *'Like hand-to-hand combat': Florida health system battles vaccine hesitancy 1 employee at a time*, Becker's Hospital Review (Nov. 4, 2021), https://www.beckershospitalreview.com/hospital-management-administration/like-hand-to-hand-combat-florida-health-system-battles-vaccine-hesitancy-1-employee-at-a-time.html.

mandated vaccination or weekly testing.[33] And if mandatory vaccination is the only option, 72% say they will quit.[34]

36.     Employee flight does not just hamper the healthcare industry's capacity to fight COVID-19, but to address other healthcare risks as well. As the CEO of one Florida health system put it: "If today I said, 'everybody's required to take the vaccine or you're terminated,' then I have a problem being able to take care of people who show up to our ER with strokes, or chest pains, or medical admissions or surgical admissions."[35] And as CMS concedes, 86 Fed. Reg. at 61,612, given the already-severe staffing shortage in the healthcare industry, "[e]ven a small fraction of" so-called "recalcitrant unvaccinated employees" could "disrupt facility operations," *id.*, and have a "disastrous impact" on patient care.[36]

37.     To be sure, *encouraging* vaccination of healthcare workers is good policy. Indeed, such measures have proven effective in Florida. To cite one example,

---

[33] Liz Hamel et al., *KFF COVID-19 Vaccine Monitor: October 2021*, KFF (Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/poll-finding/kff-covid-19-vaccine-monitor-october-2021/.
[34] *Id.*
[35] Jacqueline LaPointe, *Hospitals Staffing Shortages a Concerns with Mandatory Vaccinations*, Revcycle Intelligence (July 26, 2021), https://revcycleintelligence.com/news/hospital-staffing-shortages-a-concern-with-mandatory-vaccinations.
[36] *Health care group worried vaccine mandate will impact Missouri nursing homes*, Fox 2 Now (Nov. 5, 2021), https://fox2now.com/news/health-care-group-worried-vaccine-mandate-will-impact-missouri-nursing-homes/.

a healthcare system raised staff vaccination rates by 10% through vaccination-education strategies.[37]

38.   Mandates, however, are another matter altogether. In addition to the issues already discussed, they may even "chill" individuals who might otherwise take the vaccine voluntarily.[38]

<u>The Federal Government's Response to the COVID-19 Pandemic</u>

39.   In January 2020, HHS declared the COVID-19 pandemic a public health emergency. Though public health emergency designations naturally expire after 90 days, 42 U.S.C. § 247d, HHS has renewed the designation each time it was set to expire.[39]

40.   Almost a year ago, in December 2020, COVID-19 vaccines began to become available to the general public. On December 11, 2020, the Food & Drug Administration (FDA) authorized the emergency use of the two-dose Pfizer-Biotech vaccine. A week later, FDA did the same for the two-dose Moderna vaccine. On

---

[37] Hannah Mitchell, *'Like hand-to-hand combat': Florida health system battles vaccine hesitancy 1 employee at a time*, Becker's Hospital Review (Nov. 4, 2021), https://www.beckershospitalreview.com/hospital-management-administration/like-hand-to-hand-combat-florida-health-system-battles-vaccine-hesitancy-1-employee-at-a-time.html.

[38] Bailey LeFever, *Majority of Florida's long-term care staffers refused coronavirus vaccine*, Tampa Bay Times (Apr. 1, 2021), https://www.tampabay.com/news/health/2021/04/01/majority-of-floridas-long-term-care-staffers-refused-coronavirus-vaccine/.

[39] *COVID-19 Public Health and Medical Emergency Declarations and Waivers*, PHE (Apr. 16, 2021), https://www.phe.gov/emergency/events/COVID19/Pages/2019-Public-Health-and-Medical-Emergency-Declarations-and-Waivers.aspx.

February 27, 2021, FDA did the same for the one-dose Johnson & Johnson vaccine.[40]

And almost immediately, healthcare workers became eligible to take the vaccine.[41]

41.    Despite these authorizations and the longstanding public health emergency declaration, the federal government never sought to mandate vaccinations to fight COVID-19 in any sector, let alone the healthcare sector. Rather, it opted for less-intrusive measures. In May 2021, for instance, CMS issued an interim final rule (IFR) that required long term care facilities and intermediate care facilities for individuals with intellectual disabilities to educate staff and residents about the vaccine and make the vaccine available to them. 86 Fed. Reg. at 26,306 (May IFR). This, in CMS's view, was "necessary to help protect the health and safety" of residents. *Id.* Mandatory vaccination, however, was not required.

42.    Similarly, in June 2021, the Occupational Health and Safety Administration (OSHA) issued a COVID-19 Healthcare Emergency Temporary Standard (ETS), which aimed to protect healthcare workers from occupational exposure to COVID-19. 86 Fed. Reg. at 32,376 (June ETS). Under the June ETS— which remains in effect—covered healthcare employers must implement measures like transmission-based precautions, personal protective equipment, and physical

---

[40] Carl Zimmer et al., *Coronavirus Vaccine Tracker*, The New York Times, https://www.nytimes.com/interactive/2020/science/coronavirus-vaccine-tracker.html.

[41] Maggie Fox, *Some Americans should start getting the first Covid-19 vaccine today. It will take months before everyday people get the shots*, CNN (Dec. 14, 2020), https://www.cnn.com/2020/12/14/health/covid-vaccine-timeline/index.html (reporting that healthcare workers would be eligible for vaccination in December 2020).

distancing. *Id.* at 32,426–57. The June ETS also requires employers to provide paid leave for employees to receive COVID-19 vaccines. *Id.* at 32,599. But like CMS's May IFR, the June ETS did not mandate vaccination.

The Biden Administration's Actions

43.     Despite pushing the envelope in numerous ways during the COVID-19 pandemic, *e.g.*, *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2486 (2021); *Florida v. Becerra*, 8:21-cv-839, 2021 WL 2514138 (M.D. Fla. June 18, 2021), the Biden Administration at first drew a hard line on vaccine mandates: In its view, mandating vaccines was "not the role of the federal government."[42]

44.     Not long after, though, the President's "patience" with the unvaccinated "w[ore] thin," prompting him to announce three new administrative actions aimed at compelling much, if not most, of the adult population in the United States to receive a COVID-19 vaccine.[43]

45.     First, the President announced that he would issue an executive order requiring all executive branch employees and federal contractors to be vaccinated.[44]

---

[42] *Press Briefing by Press Secretary Jen Psaki, July 23, 2021*, The White House (July 23, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

[43] *Remarks by President Biden on Fighting the COVID-19 Pandemic*, The White House (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/.

[44] *Id.*

46.     Second, the President announced that the Department of Labor would develop an emergency rule mandating that private employers with 100 or more employees require their employees to become fully vaccinated or submit to weekly testing.[45]

47.     Finally, as relevant here, the President announced that the federal government would publish a rule mandating vaccines for employees who work at healthcare facilities that accept Medicare and Medicaid.[46] Even though he stated a month earlier that HHS would only require nursing homes to vaccinate their employees,[47] he expanded this mandate, announcing that the rule would require all participating facilities to have their employees vaccinated.[48]

<u>The Mandate</u>

48.     CMS published that regulation—the mandate—on November 5, 2021. 86 Fed. Reg. at 61,555.

---

[45] *Id.*

[46] *Id.*

[47] *FACT SHEET: President Biden to Announce New Actions to Protect Americans from COVID-19 and Help State and Local Leaders Fight the Virus*, The White House (Aug. 18, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/18/fact-sheet-president-biden-to-announce-new-actions-to-protect-americans-from-covid-19-and-help-state-and-local-leaders-fight-the-virus/.

[48] *Biden-Harris Administration to Expand Vaccination Requirements for Health Care Settings*, CMS (Sept. 9, 2021), https://www.cms.gov/newsroom/press-releases/biden-harris-administration-expand-vaccination-requirements-health-care-settings.

49.    The mandate directs participating facilities[49] to ensure that covered employees[50] submit to COVID-19 vaccination, unless the employees are eligible for a religious or medical exemption. *Id.* at 61,572.

50.    The mandate deploys "a common set of provisions for each" participating facility; there are "no substantive regulatory differences across settings." *Id.* at 61,570.

51.    It operates in two phases. Phase 1 requires that covered employees receive either the first dose of a two-dose vaccine or the sole dose of a single-dose vaccine by December 6, 2021. *Id.* at 61,573. Phase 2 requires that covered employees receive the second dose of a two-dose vaccine by January 4, 2022. *Id.*

52.    To comply with the mandate, a participating facility must implement a "process for tracking and securely documenting the COVID-19 vaccination status

---

[49] Participating facilities subject to the mandate include: ambulatory surgical centers; hospices; psychiatric residential treatment facilities; programs of all-inclusive care for the elderly; hospitals; long term care facilities, including skilled nursing facilities and nursing facilities, generally referred to as nursing homes; intermediate care facilities for individuals with intellectual disabilities; home health agencies; comprehensive outpatient rehabilitation facilities; critical access hospitals; clinics, rehabilitation agencies, and public health agencies as providers of outpatient physical therapy and speech-language pathology services; community mental health centers; home infusion therapy suppliers; rural health clinics/federally qualified health centers; and end-stage renal disease facilities. 86 Fed. Reg. at 61,569–70.

[50] Covered employees subject to the mandate include: facility employees; licensed practitioners; students, trainees, and volunteers; and individuals who provide care, treatment, or other services for the facility and/or its patients, under contract or other arrangement. 86 Fed. Reg. 61,570. The requirements also extend to staff who provide care outside of a formal clinical setting and to "any individual that performs their duties at any site of care, or has the potential to have contact with anyone at the site of care." *Id.* at 61,570–71. Employees working 100% remotely are exempt. *Id.* at 61,571.

of all staff," including booster-shot status. 42 C.F.R. § 416.51(c)(3)(iv)–(v). It must also "track[] and securely document[]" all exemptions. *Id.* § 416.51(c)(3)(vi)–(vii). And it must implement "[c]ontingency plans" for all persons who are "not fully vaccinated." *Id.* § 416.51(c)(3)(x).

53.     As for enforcement, CMS intends to issue "interpretive guidelines" that outline "enforcement remedies" CMS can pursue against participating facilities that do not comply. 86 Fed. Reg. at 61,574. These will include "civil money penalties, denial of payments for new admissions, or termination of the Medicare/Medicaid provider agreement." *Id.* A senior White House official has made clear that CMS "will not hesitate to use [its] full enforcement authority" to carry out the mandate.[51]

54.     CMS, however, does not intend to enforce the mandate alone—it expects the States to help. Consistent with their contracts with CMS, *see* 42 U.S.C. § 1395aa(a), States must verify that healthcare facilities operating in their borders comply with the mandate. CMS plans to "advise and train State surveyors on how to assess compliance with the new requirements" and how to review "the entity's records of staff vaccinations." 86 Fed. Reg. at 61,574. It will also "instruct surveyors

---

[51] *Background Press Call on OSHA and CMS Rules for Vaccination in the Workplace*, The White House (Nov. 3, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/11/04/background-press-call-on-osha-and-cms-rules-for-vaccination-in-the-workplace/.

to conduct interviews staff [sic] to verify their vaccination status," and will tell surveyors how they "should cite" facilities "when noncompliance is identified." *Id.*

55.    CMS "expect[s]" its vaccine mandate "to remain relevant for some time beyond the end" of the declared public health emergency and anticipates retaining the mandate "as a permanent requirement for facilities." *Id.* at 61,574.

56.    The mandate has "near-universal applicability" to healthcare staff, covering an estimated 10.3 million employees. *Id.* at 61,603. By CMS's own estimate, about 2.4 million of these employees are unvaccinated. *Id.* at 61,607. And, as CMS concedes, the mandate's chief aim is to coerce these unvaccinated employees to submit to vaccination upon pain of unemployment. *See id.* ("The most important inducement will be the fear of job loss, coupled with the examples set by fellow vaccine-hesitant workers who are accepting vaccination more or less simultaneously"); *id.* at 61,608 ("[I]t is possible there may be disruptions in cases where substantial numbers of health care staff refuse vaccination and are not granted exemptions and are terminated, with consequences for employers, employees, and patients.").

<u>CMS's Failure to Consult or Engage in Notice and Comment</u>

57.    CMS concedes that this is new ground for the agency. By its own admission, it has "not previously required" mandatory vaccinations as a condition for participation in Medicare or Medicaid. *Id.* at 61,567. In fact, the federal

government has never required any private industry to submit to mandatory vaccination.

58.     Despite this marked departure from prior practice, though, CMS did not "consult" with "appropriate State agencies" before issuing its Mandate, as it is required to do under 42 U.S.C. § 1395z. *Id.* at 61,567. In CMS's view, the consultation statute does not require that it consult *before* publishing a rule. *Id.* And even if it did, says CMS, there is no agency with which it would be "appropriate" to consult before publishing the rule "[g]iven the urgent need" for a mandate here. *Id.*

59.     Similarly, CMS did not engage with interested stakeholders through the notice and comment process. *Id.* at 61,583 (citing 5 U.S.C § 553(b); 42 U.S.C § 1395hh(b)(1)). Instead, it found for "good cause" that it would "be impracticable and contrary to the public interest . . . to undertake normal notice and comment procedures." *Id.* at 61,586. It supported its good-cause determination based primarily on the COVID-19 pandemic, the Delta variant, and the upcoming flu season. *See id.* at 61,583–84.

<u>CMS's Justifications for the Mandate</u>

60.     In justifying its mandate, CMS offers internally inconsistent reasoning and fails to adequately consider data that undermined its decision.

61.     To start, CMS claims to consider "concerns about health care workers choosing to leave their jobs rather than be vaccinated," yet it ultimately finds that

the mandate was justified given that there is "insufficient evidence to quantify and compare adverse impacts on patient and resident care associated with temporary staffing losses due to mandates and absences due to quarantine for known COVID-19 exposures and illness." *Id.* at 61,569.

62.    This lack of data, however, is not cause to issue an industry-wide mandate; it is cause to exercise *restraint* in issuing such a mandate.

63.    As CMS concedes, there "might be a certain number of health care workers who choose" to leave the medical field because of the mandate. *Id.* at 61,569. And because it is "unknown . . . how rapidly those quitting rather than being vaccinated could be replaced," *id.* at 61,612, CMS admits that current "endemic staff shortages . . . may be made worse if any substantial number of unvaccinated employees leave health care employment altogether," *id.* at 61,607. Indeed, given the already "critical staffing shortage," *id.* at 61,559, CMS acknowledges that worker resignations need not even be substantial to do damage: If "[e]ven a small fraction of" those CMS pejoratively labels "recalcitrant unvaccinated employees" quit, it "could disrupt facility operations." *Id.* at 61,612. In some cases, this impact will be "disastrous,"[52] especially in rural areas, which, as CMS admits, are "having greater problems with employee vaccination." *Id.* at 61,613.

---

[52] *Health care group worried vaccine mandate will impact Missouri nursing homes*, Fox 2 Now (Nov. 5, 2021), https://fox2now.com/news/health-care-group-worried-vaccine-mandate-will-impact-missouri-nursing-homes/.

64.    Along with this, CMS recognizes that the "providers and suppliers regulated under this rule are diverse in nature, management structure, and size." *Id.* at 61,602. Even so, CMS relies mostly on facts and figures involving long term care facilities—providers who serve mostly elderly and often immunocompromised patients—to justify applying the mandate to other Medicare- and Medicaid-certified providers. *See, e.g.*, *id.* at 61,585 (discussing "case rates among [long term care] facility residents," and claiming, without citation that those facilities' "experience may generally be extrapolated to other settings"). CMS does so despite conceding that "[a]ge remains a strong risk factor for severe COVID-19 outcomes," *id.* at 61,566, and that "risk of death from infection from an unvaccinated 75- to 84-year-old person is 320 times more likely than the risk for an 18- to 29-years old person," *id.* at 61,610 n.247.

65.    CMS also claims to have "considered requiring daily or weekly testing of unvaccinated individuals" instead of mandatory vaccination. *Id.* at 61,614. But it rejects this alternative in about a sentence, concluding that vaccination is a "more effective infection control measure." *Id.* OSHA, by contrast, issued a vaccine mandate on the same day that includes a weekly testing alternative. *See* COVID-19 Vaccination and Testing; Emergency Temporary Standard, 86 Fed. Reg. 61,402, 61,450 (Nov. 5, 2021). Indeed, despite concluding that testing is "not as effective as vaccination," OSHA permitted testing because it is "still effective" and because

OSHA had concerns about imposing a "strict vaccination mandate with no alternative" on such short notice given the potential "economic and health impacts" of such a decision.[53] *Id.* at 61,433, 61,436.

66.   CMS further "considered whether it would be appropriate to limit COVID-19 vaccination requirements to staff who have not previously been infected by SARS-CoV-2." 86 Fed. Reg. at 61,614. Yet it decides against that option because it does not think that "natural immunity" is "equivalent to receiving the COVID-19 vaccine." *Id.* at 61,559. Elsewhere, however, CMS recognizes the value of natural immunity when it states that each day 100,000 people are "recover[ing] from infection," that they "are *no longer sources of future infections*," and that their natural immunity "reduce[s] the risk to both health care staff and patients substantially." *Id.* at 61,604 (emphasis added). And indeed, a highly reported study from Israel found that "natural immunity confers longer lasting and stronger protection" against the Delta variant than vaccination.[54]

67.   CMS claims that the mandate is needed to protect patients from COVID-19 infection, yet it does not require that patients be vaccinated and

---

[53] OSHA also could not establish a "grave danger" to most healthcare workers because it found that its June ETS adequately protects against COVID-19 risk. 86 Fed. Reg. at 61,421. CMS does not acknowledge this finding.

[54] *See* Sivan Gazit et al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, medRxiv (Aug. 24, 2021), https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.

recognizes that "the effectiveness of the vaccine to prevent disease transmission by those vaccinated [is] not currently known." *Id.* at 61,615.

<u>Irreparable Harm to Florida</u>

68.    The mandate places Florida in an untenable position. On the one hand, if Florida refuses to comply with the mandate, its state-run facilities that participate in Medicare and Medicaid will be subject to fines and lose millions of dollars in funding. On the other hand, if Florida complies with the mandate, its facilities will lose critical staff, exacerbating an already-severe staffing crisis. To weather the staffing dip, its facilities will either need to pay exorbitant premiums to contract staffing agencies or provide a diminished quality of patient care. They will also bear the cost of ensuring that their employees have complied with the mandate, which they cannot recover in a suit against the federal government. *See Chiles v. Thornburgh*, 865 F.2d 1197, 1209 (11th Cir. 1989); *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). And adding insult to injury, compliance will make Florida complicit in an unlawful policy that it fundamentally opposes, undermining its sovereignty.

69.    Florida's AHCA also faces an equally untenable choice. It is obligated by contract and the mandate to survey participating facilities to verify compliance with the mandate. If it refuses to comply, it stands to lose millions in federal funding. And if it submits, it will be forced to expend additional resources while carrying out

25

CMS's compliance checks, which it again cannot recover in a suit against the federal government. *See Chiles*, 865 F.2d at 1209.

70.    Further, the mandate will require private healthcare facilities in Florida to bear the administrative cost of ensuring compliance with the mandate, which they too cannot recover. *Id.* They will also lose employees who refuse to submit to vaccination, further straining the resources of those facilities, injuring the public health, and taxing Florida's economy.

71.    Finally, the Florida Legislature is currently contemplating legislation that would prohibit vaccine mandates.[55] This legislation is likely to pass within the next few days. Once it does, Florida will face an additional sovereign injury.

## CLAIMS

## COUNT 1

### Agency action that is not in accordance with law and is in excess of authority, in violation of the APA

72.    Florida repeats and incorporates by reference ¶¶ 1–71.

73.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory . . . authority, or

---

[55] *Governor DeSantis Joined By President Simpson and Speaker Sprowls to Announce Legislative Agenda for Special Session of the Florida Legislature*, Florida Governor's Office (Nov. 8, 2021), https://www.flgov.com/2021/11/08/governor-desantis-joined-by-president-simpson-and-speaker-sprowls-to-announce-legislative-agenda-for-special-session-of-the-florida-legislature/.

limitations, or short of statutory right," or "without observance of procedure required by law." *See* 5 U.S.C. § 706(2)(A), (C)–(D).

74.   The mandate is contrary to law for at least two reasons.

75.   *First*, the mandate violates 42 U.S.C. § 1395z because it was issued without required consultation with the States.

76.   Under § 1395z, CMS "shall consult with appropriate State agencies and recognized national listing or accrediting bodies" in "carrying out [its] functions" relating to "determination of conditions of participation" for many healthcare providers subject to the mandate. 42 U.S.C. § 1395z.[56] CMS did not do so.

77.   *Second*, the mandate exceeds CMS's statutory authority.

78.   Indeed, Congress speaks clearly when it "authoriz[es] an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. And courts apply a presumption that Congress "preserves the constitutional balance between the National Government and the States." *Bond v. United States*, 572 U.S. 844, 862 (2014). But nothing in the several provisions that govern Medicaid and Medicare clearly authorizes a vaccine mandate.

---

[56] Specifically, the consultation requirement applies to conditions of participation for hospitals under § 1395x(e)(9), psychiatric hospitals under § 1395x(f)(4), skilled nursing facilities under §§ 1395x(j) and 1395i-3, home health agencies under § 1395x(o)(6), comprehensive outpatient rehabilitation facilities under § 1395x(cc)(2), hospices under § 1395x(dd)(2), critical access hospitals under §§ 1395x(mm)(1) and 1395i-4(e), and ambulatory surgical centers under § 1395k(a)(2)(F)(i).

79.     To the contrary, § 1395 makes clear that no federal officer may "exercise any supervision or control" over (a) "the practice of medicine or the manner in which medical services are provided," (b) "the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services," or (c) "the administration or operation of any such institution, agency, or person." 42 U.S.C. § 1395. The mandate does just that.

80.     For these reasons, the mandate is contrary to law.

## COUNT 2

### Failure to conduct notice and comment in violation of the APA

81.     Florida repeats and incorporates by reference ¶¶ 1–71.

82.     The APA requires notice of, and comment on, agency rules that "affect individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979); *see* 5 U.S.C. §§ 553, 706(2)(D). The Medicare and Medicaid schemes track these requirements. *See* 42 U.S.C § 1395hh(b)(1).

83.     CMS concedes that it did not engage in notice and comment. 86 Fed. Reg. at 61,583. Instead, it invokes the "good cause" exception, which permits an agency to waive notice and comment when it finds for "good cause" that the process is "impracticable, unnecessary, or contrary to the public interest." *Id.* at 61,583 (citing 5 U.S.C § 553(b)(B)). This standard is notoriously difficult to satisfy. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012).

84.     CMS relies on the COVID-19 pandemic for good cause, along with related circumstances like the Delta variant. *Id.* at 61,583–84. Of course, no one contests the seriousness of the COVID-19 pandemic. But after almost two years, COVID-19 is a persistent feature of life and cannot itself constitute good cause. *See Becerra*, 2021 WL 2514138, at *45; *Regeneron Pharms., Inc. v. HHS*, 510 F. Supp. 3d 29, 48 (S.D.N.Y. 2020). To hold otherwise would effectively repeal notice and comment requirements for the duration of the pandemic.

85.     In fact, CMS's own delay is what caused its so-called emergency. Vaccines have been available to healthcare workers for nearly a year. 86 Fed. Reg. at 61,584.[57] But until now, CMS made no efforts to mandate vaccination. "Good cause cannot arise as a result of the agency's own delay." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2d Cir. 2018). And CMS waited nearly three additional months between announcing the mandate and publishing it.

86.     CMS's other good-cause justifications fare no better. Most prevalent, it cites the possibility for a "more severe" flu season as support for good cause given the risks of "coinfection" and increased "stress" on the healthcare system. *See* 86

---

[57] Maggie Fox, *Some Americans should start getting the first Covid-19 vaccine today. It will take months before everyday people get the shots*, CNN (Dec. 14, 2020), https://www.cnn.com/2020/12/14/health/covid-vaccine-timeline/index.html (reporting that healthcare workers would be eligible for vaccination in December 2020).

Fed. Reg. at 61,584. Yet in the next breath, CMS admits that "the intensity of the upcoming 2021–2022 influenza season cannot be predicted" and that "influenza activity during the 2020–2021 season was low throughout the U.S." *Id.*

87.    Moreover, notice and comment is needed to bolster the "fairness, wisdom, and political legitimacy" of a rule of this magnitude. *Becerra*, 2021 WL 2514138, at *45 (quoting Hickman & Pierce, Administrative Law Treatise § 5.10 (6th ed. 2020)).

88.    For these reasons, notice and comment was required.

## COUNT 3

### Arbitrary and capricious agency action in violation of the APA

89.    Florida repeats and incorporates by reference ¶¶ 1–71.

90.    Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). The mandate is arbitrary and capricious for several reasons.

91.    First, the mandate does not adequately consider the alternative of testing requirements. *See DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). CMS claims to have "considered requiring daily or weekly testing of unvaccinated individuals" instead of mandatory vaccination. 86 Fed. Reg. at 61,614. But it dismisses this alternative in a cursory sentence, proclaiming that vaccination is a "more effective infection control measure." *Id.*

92.     Second, CMS fails to "articulate a satisfactory explanation" for why its mandate is "rational" given that unvaccinated workers may flee the industry. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

93.     Third, CMS fails to adequately consider the impact its mandate will have on vaccination-education efforts. In Florida, those efforts have had great success, sometimes raising vaccination rates by ten percent.[58] Yet CMS fails to consider to what extent its mandate will "chill" individuals who might otherwise take the vaccine voluntarily.

94.     Fourth, CMS does not rationally connect its statistics to most of the healthcare facilities covered by its mandate. Indeed, CMS recognizes that the "providers and suppliers regulated under this rule are diverse in nature, management structure, and size." *Id.* at 61,602. Still, CMS relies mostly on facts and figures involving long term care facilities—providers that serve mostly elderly or immunocompromised patients—to justify applying the mandate to other providers. *See, e.g.*, *id.* at 61,585.

95.     Fifth, CMS does not consider the rate at which "game-changing" COVID-19 treatments minimize the more-serious health risks of COVID-19. Nor

---

[58] Hannah Mitchell, *'Like hand-to-hand combat': Florida health system battles vaccine hesitancy 1 employee at a time*, Becker's Hospital Review (Nov. 4, 2021), https://www.beckershospitalreview.com/hospital-management-administration/like-hand-to-hand-combat-florida-health-system-battles-vaccine-hesitancy-1-employee-at-a-time.html.

does CMS consider the viability of state-by-state approaches to mandatory vaccination, despite acknowledging that, in some States, COVID-19 cases "are trending downward." *Id.* at 61,583–84.

96.    Sixth, CMS concludes that prior COVID-19 infection should not qualify a covered employee for an exemption from the mandate because it is not equivalent to receiving a COVID-19 vaccine. *Id.* at 61,559, 61,614. Elsewhere, however, CMS recognizes the value of natural immunity. *See id.* at 61,604 (finding natural immunity "reduce[s] the risk to both health care staff and patients substantially"); *id.* (noting that those who recover are "in very rare cases still infectious").

97.    Seventh, CMS inconsistently claims the mandate will protect patients while recognizing, in its cost-benefit analysis, that "the effectiveness of the vaccine to prevent disease transmission by those vaccinated [is] not currently known." *E.g.*, 86 Fed. Reg. at 61,569, 61,615.

98.    Eighth, CMS fails to consider the interests of millions of healthcare workers who pursued their careers without knowing they would be subject to mandated vaccination. *Regents*, 140 S. Ct. at 1913. And it ignores the reliance interests of healthcare employers, including the States, who ordered their affairs under the assumption that Medicaid and Medicare dollars would be available without this onerous condition.

99.     Ninth, the mandate is the product of political pressure, not measured judgment. *Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011). The true impetus is clear: facing a scandal over his actions in Afghanistan, dismal approval numbers on his COVID response, and an inability to advance his legislative agenda, President Biden succumbed to pressure to control the healthcare decisions of millions. He did so even though his Administration had assured the public that vaccine mandates are "not the role of the federal government."[59]

100.    Finally, CMS fails to adequately explain its extreme departure from its prior practice of not mandating vaccines. *See E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 858 (N.D. Cal. 2018); *accord Regents*, 140 S. Ct. at 1913.

101.    For these reasons, the mandate is arbitrary and capricious.

## COUNT 4

### Violation of the Spending Clause

102.    Florida repeats and incorporates by references ¶¶ 1–71.

103.    The mandate is also an unconstitutional condition on Florida's receipt of federal funds.

"[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly."

---

[59] *Press Briefing by Press Secretary Jen Psaki, July 23, 2021*, The White House (July 23, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/.

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Here, Florida agreed to a lucrative contract, paying millions in federal funds, to enforce Medicare and Medicaid requirements on healthcare providers. When it agreed to do so, however, it was given no notice that it would have to enforce vaccination requirements. Florida now faces the untenable choice of refusing to enforce the mandate, and losing millions, or acquiescing. But the Spending Clause does not allow the government to put Florida to this choice—any conditions must have been disclosed to Florida from the beginning. *Pennhurst*, 451 U.S. at 17; *cf. NFIB*, 567 U.S. at 584.

104.   For this reason, the mandate violates the Spending Clause.

## COUNT 5

**Declaratory judgment that the Biden Administration's policy is unlawful**

105.   Florida repeats and incorporates by reference ¶¶ 1–71.

106.   For the same reasons described in Counts 1–4, Florida is entitled to a declaratory judgment that Defendants are violating the law.

## PRAYER FOR RELIEF

For these reasons, Florida asks the Court to:

a)  Hold unlawful and set aside the mandate.

b)  Issue a temporary restraining order and preliminary and permanent injunctive relief enjoining Defendants from enforcing the mandate.

c)  Issue declaratory relief declaring Defendants' actions unlawful.

d)  Award Florida costs and reasonable attorney's fees.

e)  Award such other relief as the Court deems equitable and just.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Daniel Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

*/s/ David M. Costello*
David M. Costello (FBN 1004952)
ASSISTANT SOLICITOR GENERAL

Natalie Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Jason H. Hilborn (FBN 1008829)
DEPUTY SOLICITOR GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
david.costello@myfloridalegal.com

*Counsel for the State of Florida*

36