# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

STATE OF FLORIDA,

   *Plaintiff*,

   v.                                No. 3:21-cv-2722-MCR-HTC

DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

   *Defendants*.

_____/

## FLORIDA'S EMERGENCY MOTION
## FOR INJUNCTION PENDING APPEAL

Three days ago, this Court denied Florida's Motion for Temporary Restraining Order or Preliminary Injunction, concluding that Florida has not established that it will suffer irreparable harm because of CMS's vaccine mandate. ECF No. 6 (Order). Yet Florida has already suffered irreparable harm: The mandate purports to preempt state laws that bar employers from requiring employees to submit to vaccination, and Florida's officials must violate such state laws to comply with the mandate. Moreover, the other harms that the Court addressed are neither speculative nor reparable. And the Court did not address a host of other impending harms, each of which independently suffices to satisfy the irreparable-harm element.

In less than two weeks, CMS's mandate will gut a healthcare industry already on the brink. The rule requires the first dose of the vaccine no later than December

6, 2021. *Medicare and Medicaid Programs: Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61,555, 61,573 (Nov. 5, 2021). To prevent those harms, Florida has appealed the Court's Order. ECF No. 8. And given the urgency and seriousness of this matter, it now moves for an emergency injunction pending appeal. Florida intends to seek an injunction pending appeal with the Eleventh Circuit no later than Monday, November 29, 2021, should this Court not afford Florida relief before then.

## LEGAL STANDARD

Even when a court "refuses . . . an injunction," it may nevertheless "grant an injunction" while "an appeal" from its order "is pending." Fed. R. Civ. P. 62(d). The relevant considerations are substantially that of a request for preliminary injunction. *See Ga. Republican Party, Inc. v. Sec'y of State for Ga.*, 2020 WL 7488181, at *1 (11th Cir. Dec. 21, 2020). The movant must show "(1) a substantial likelihood that [the movant] will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury to [the movant] unless the injunction is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest." *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000) (en banc). The fact that unlawful government action purports to stem the spread of COVID-19 does not prevent a movant from meeting the third and fourth prongs. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020).

# ARGUMENT

To avoid needlessly expending the Court's resources, Florida relies on and incorporates the arguments raised in its Motion for Temporary Restraining Order or Preliminary Injunction, ECF No. 2.[1] It will instead focus on the Court's concerns about irreparable harm and on irreparable harms that the Court did not address.

**1.** To start, the Court rejected Florida's argument that the mandate infringes on Florida's sovereignty by purporting to preempt state law prohibiting vaccine mandates. Order at 10. The Court reasoned that the argument was premature because Florida is merely "*contemplating*" a ban on vaccine mandates. *Id.* It also held that the argument "lacks merit" at any rate. *Id.* With respect, the Court was mistaken on both the facts and the law.

On the facts, when this Court issued its order on November 20, Florida was not merely contemplating a ban on vaccine mandates: It had enacted one. *E.g.*, Fla. Stat. §§ 381.00317, 112.0441, 381.00319 (enacted Nov. 18, 2021). So Florida's sovereign harm began before the Court denied the State's motion and is ongoing, not "speculative." Order at 10.

---

[1] In its motion, Florida relied on a declaration from the Department of Corrections stating that a private hospital in Florida was requiring correctional officers to comply with the mandate to enter its facilities. *See* ECF No. 2, at 11. Since that time, the hospital has informed the Department that it no longer intends to enforce that requirement.

On the law, Florida's sovereign harm is irreparable. The "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Hand v. Scott*, 888 F.3d 1206, 1215 (11th Cir. 2018) (Florida suffered irreparable harm when "it could not apply its own laws"). As does federal action that infringes on a State's "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227–28 (10th Cir. 2001); *see also West Virginia v. Dep't of Treasury*, 2021 WL 5300944, at *19 (N.D. Ala. Nov. 15, 2021) (federal law caused irreparable harm when it "intrud[ed] on [a] State's ability to exercise its indispensable sovereign power to tax" (quotations omitted)). The mandate does precisely that: It claims to preempt conflicting state laws, bans on vaccine mandates included. 86 Fed. Reg. at 61,613. In so doing, the mandate threatens to hobble Florida's ability to enforce its chosen policy initiatives, undermining its sovereignty without financial recourse. *See Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013).

The mandate also inflicts sovereign harm in another way. It "forc[es] state officials to choose between violating a federal rule to comply with [state] law, and vice versa," *Texas v. United States*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015), an injury to the State's autonomy that is irreparable because it cannot be remedied financially, *Odebrecht*, 715 F.3d at 1289.

2. Next, the Court rejected Florida's claim that it will lose state employees because some will not take the vaccine, concluding that Florida lacked "supporting factual evidence." Order at 8–9. But Florida has in fact shown irreparable harm on this basis.

First, in establishing irreparable harm, Florida need not show that impending harm is "inevitable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). It need show only that irreparable harm is "likely . . . in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). In making this determination, the Court should consider "the predictable effect of Government action on the decisions of third parties." *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019). And here, it is perfectly clear that a "predictable effect" of the mandate is the loss of healthcare employees.

COVID-19 vaccines have been available to healthcare workers since December 2020.[2] Even so, as CMS stressed in issuing its rule, 86 Fed. Reg. at 61,604–06, many healthcare workers remain unvaccinated. For example, about "70% of the clinical licensed practical nurses" at Florida's Walton Community Health Center are unvaccinated. ECF No. 2-3 ¶ 18. Similarly, Florida's Agency for

---

[2] *Medicare and Medicaid Programs: Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61,555, 61,584 (Nov. 5, 2021); Maggie Fox, *Some Americans should start getting the first Covid-19 vaccine today. It will take months before everyday people get the shots*, CNN (Dec. 14, 2020), https://www.cnn.com/2020/12/14/health/covid-vaccine-timeline/index.html (reporting that healthcare workers would be eligible for vaccination in December 2020).

Health Care Administration (AHCA) found just a few months ago that 42% of Florida hospital workers were not vaccinated.[3] And given the longstanding availability of COVID-19 vaccines, it is "predictable" that at least some of these workers have not yet taken a vaccine because they fundamentally oppose doing so and will not take one even on pain of termination. *See Commerce*, 139 S. Ct. at 2566.

In fact, CMS has admitted as much. In issuing its mandate, it recognized that there "might be a certain number of health care workers who choose" to leave the medical field as a result. 86 Fed. Reg. at 61,569. It even cited one instance where triple-digit numbers of workers resigned or were fired from a single facility for refusing to take a vaccine. *Id.* at 61,569 n.155 (citing a report that 153 employees of Houston Methodist Hospital quit following its vaccination mandate).[4] And these findings track data from a national poll published just a week before the mandate issued, which found that 72% of unvaccinated workers will quit rather than succumb.[5] Altogether, this evidence more than establishes that, without an injunction, employee loss is likely to occur. *See Benisek*, 138 S. Ct. at 1944.

---

[3] Liz Crawford, *AHCA: 42% of Florida hospital workers weren't vaccinated, as of June 4*, WTSP (July 22, 2021), https://www.wtsp.com/article/news/health/coronavirus/vaccine/hospital-workers-not-vaccinated/67-9e842ff1-e5b0-4f1f-8f9f-ccfec865ccbf.

[4] Dan Diamond, *153 people resigned or were fired from a Texas hospital system after refusing to get vaccinated*, The Washington Post (June 22, 2021), https://www.washingtonpost.com/health/2021/06/22/houston-methodist-loses-153-employees-vaccine-mandate/.

[5] Liz Hamel et al., *KFF COVID-19 Vaccine Monitor: October 2021*, KFF (Oct. 28, 2021), https://www.kff.org/coronavirus-covid-19/poll-finding/kff-covid-19-vaccine-monitor-october-2021/.

The Court denied Florida's motion in part because it mistakenly thought that any "statements regarding employees' intent to resign are hearsay." Order at 9. But such statements fall within the state-of-mind exception to the hearsay rule. *See* Fed. R. Evid. 803(3). That exception permits the use of an out-of-court statement to show "the declarant's then-existing state of mind (such as motive, intent, or plan)." *Id.* Here, any hearsay statements from employees merely establish that they intend to resign if forced to vaccinate, and are thus admissible under Rule 803(3). *See, e.g., Christian Tennant Custom Homes of Fla., Inc. v. EBSCO Gulf Coast Dev., Inc.*, 2017 WL 4102458, at *4 (N.D. Fla. Sept. 15, 2017) (Rodgers, C.J.) (holding that hearsay evidence was admissible under state-of-mind exception when it proved declarant's intent to enter into a contract).

And even if this exception did not apply, the Court may consider hearsay at "the preliminary injunction stage" if "the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (quotation omitted). Hearsay evidence is no doubt appropriate here. CMS has given the States an exceedingly short timeframe to gather evidence to challenge the mandate—just 30 days, less than half the time CMS needed to craft the rule. *See* ECF No. 2 at 22. Making matters more difficult, vaccination status and preference is a deeply personal issue, so it is hard to obtain on-record statements from employees who plan to decline a vaccine.

These unique circumstances more than justify the use of hearsay evidence for purposes of a temporary injunction. *E.g.*, *ACLU of Fla., Inc. v. Lee*, 2021 WL 4350174, at *1 (N.D. Fla. July 1, 2021) (Winsor, J.) (considering hearsay statement at preliminary injunction phase); *Noble v. Tooley*, 125 F. Supp. 2d 481, 483 (M.D. Fla. 2000) ("Defendants' hearsay objections to these exhibits are ill-taken at this stage of the proceedings" since "a district court may rely" on "affidavits and hearsay materials" at "the preliminary injunction stage.").

**3.** The Court also reasoned that the threat of lost federal funding will not irreparably harm Florida because it can recover any funds lost if it wins this lawsuit. Order at 9–10. And it held that, in any event, there is "no evidence to suggest" that the loss of federal funding will occur immediately on December 6, 2021, because the "asserted loss of staff is speculative," particularly given the "availability of the exemption process provided in the interim final rule," and because, "even if noncompliance occurs, any potential termination of funding would not occur on December 6." *Id.* at 10. These conclusions, too, are mistaken.

At the gate, even if Florida could recover federal funding withheld during any period of noncompliance, that would not compensate Florida for the wealth of services it would be unable to provide in the interim; for the patients it would lose to other facilities, *Aurora Chi. Lakeshore Hosp. v. Azar*, 356 F. Supp. 3d 749, 759

8

(N.D. Ill. 2018), *vacated on other grounds*, 2019 WL 6911965 (N.D. Ill. Dec. 19, 2019); or for the employees it must cut loose in the process, *see id.*

Indeed, with federal funding uncertain, state-run health facilities will need to substantially scale back services, decimating their capacity to care for Florida's citizens and eviscerating a large chunk of their medical revenue. *See* ECF No. 2-2 ¶ 15; ECF No. 2-3 ¶¶ 14, 22. As patients search for care elsewhere, many will establish relationships with new providers and are unlikely to return even if federal funding renews. *See Aurora Chi. Lakeshore Hosp.*, 356 F. Supp. 3d at 759. And many state-run facilities will need to downsize their staff to weather the funding crunch, *e.g.*, ECF No. 2-3 ¶¶ 14, 22, losing valuable employees that, given the fast-paced healthcare market and the attractiveness of private-sector roles, predictably will not come back if funding ever returns, *see* ECF No. 2-2 ¶ 10; ECF No. 2-6 ¶¶ 15–16, 25. Even then, Florida will need to expend resources to facilitate the restaffing process. ECF No. 2-3 ¶¶ 11, 18.

These harms are irreparable. Florida cannot recover damages for these losses in a suit against the federal government. *Odebrecht*, 715 F.3d at 1289. The harms will also occur, at latest, on December 6, when facilities, including Florida-owned-and-operated facilities, must decide between complying with Florida law or complying with the mandate. And in reality, they will occur even earlier because Florida's facilities must arrange to be compliant with the mandate *by* December 6.

9

In other words, harmful service- and staffing-related decisions are being made right now in anticipation of the December 6 deadline.

At any rate, it is far from clear that Florida may recover all financial harms caused by the mandate. Florida has sued under the APA, which does not permit recovery of money damages. 5 U.S.C § 702; *cf. Oak Lawn Pavilion, Inc. v. HHS*, 1999 WL 1023920, at *6 (N.D. Ill. Nov. 8, 1999) (claim for unpaid Medicare payments after termination of Medicare contract was claim for "money damages"). And some Florida facilities, consistent with state law, would likely refuse to comply with the mandate and cease billing for Medicare and Medicaid services altogether. We are unaware of a mechanism under which Florida could obtain monetary relief for the amounts that a facility could have billed (but did not in fact bill) even if, at the end of a very long day, CMS's unlawful rule is struck down by the courts.

Even if Florida's lost federal funding is recoverable, its temporary loss still constitutes irreparable harm "where the loss threatens the very existence of [its facilities'] business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also GOS Operator, LLC v. Sebelius*, 2012 WL 175056, at *4 (S.D. Ala. Jan. 20, 2012) (threatened loss of Medicare/Medicaid funding constituted irreparable harm when the loss would effectively force facility to cease operating). Here, CMS has indicated that termination is on the table if a facility does not comply with the mandate, 86 Fed. Reg. at 61,574, and a senior White House official has made clear

that CMS "will not hesitate to use [its] full enforcement authority" to ensure that its mandate takes effect.[6] Seeing as federal money makes up the lion's share of funding for certain state facilities, *e.g.*, ECF No. 2-3 ¶ 13–14, 21–22, even a temporary stoppage would be a death knell for their operations, a textbook irreparable injury, *Wis. Gas Co.*, 758 F.2d at 674 ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business.").

Lastly, it does not matter whether CMS will strip Florida's facilities of their funding when the clock strikes midnight on December 6. What matters is that, come December 6, Florida's facilities will need to make an impossible decision: fire unvaccinated staff or risk defying federal law and suffering the consequences. And in any event, there is every reason to believe these consequences will follow swiftly. After all, CMS skipped notice and comment because its believes that the danger to patients is so great that it would "be contrary to the public interest to delay in imposing" a mandate. 86 Fed. Reg. at 61,586. It is thus likely that CMS will make

---

[6] *Background Press Call on OSHA and CMS Rules for Vaccination in the Workplace*, The White House (Nov. 3, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/11/04/background-press-call-on-osha-and-cms-rules-for-vaccination-in-the-workplace/.

good on its word and "will not hesitate to use [its] full enforcement authority"[7] to ensure that its mandate takes effect.[8]

**4.** Finally, the Court did not address the many other irreparable harms Florida will suffer because of the mandate.

*First*, the Court did not consider the compliance costs that Florida's facilities will pay under the mandate. Indeed, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment). As CMS acknowledges, the "initial costs of this rule fall almost entirely on health care providers and suppliers." 86 Fed. Reg. at 61,612; *see also* 86 Fed. Reg. at 61,613 (recognizing that "much," yet not all, of the mandate's costs are covered by the federal government). But because the federal government has sovereign immunity, *Odebrecht*, 715 F.3d at 1289, Florida will be unable "to recover the compliance costs [it] will incur," even if the mandate "is

---

[7] *Background Press Call on OSHA and CMS Rules for Vaccination in the Workplace*, The White House (Nov. 3, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/11/04/background-press-call-on-osha-and-cms-rules-for-vaccination-in-the-workplace/.

[8] In all events, though Florida requests injunctive relief before December 6 given the deadline for the first vaccine dose, this Court's injunction analysis is not tied to that date. The question for purposes of a temporary injunction is whether the irreparable harm is likely to "occur 'before a decision on the merits can be rendered.'" *See McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1110 (N.D. Fla. 2016) (Walker, J.) (quoting Wright & Miller, *Federal Practice and Procedure* § 2948.1 (2d ed. 1995)). Given that CMS is likely to take quick enforcement action, Florida's stated harms are likely to occur "before a decision on the merits" of Florida's appeal "can be rendered," even if they do not occur precisely on December 6. *Id.*

invalidated on the merits," *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016); *see also Wis. Gas Co.*, 758 F.2d at 674 (costs imposed on parties are irreparable where they cannot be recovered "in the ordinary course of litigation").

*Second*, AHCA is obligated by its contract with CMS to ensure compliance with the mandate. ECF No. 2-1 ¶ 5. If it refuses to comply, it will be in breach of its contract with CMS and at risk of losing the contract's multi-million-dollar value, *id.* ¶ 9–11.

*Third*, Florida suffers irreparable harm as parens patriae for the many Floridians who work in healthcare and do not wish to receive a vaccine, as well as the patients who will lose access to adequate medical care because of CMS's mandate.[9] A State has a paradigmatic sovereign interest both in "the health and well-being—both physical and economic—of its residents in general" and in "assuring that the benefits of the federal system are not denied to its general population." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607–08 (1982). It may assert those interests on its citizens' behalf. *See id.* And the mandate irreparably

---

[9] To be sure, *Massachusetts v. Mellon*, 262 U.S. 447 (1923), recognized certain limits on the use of that standing theory against the federal government. But "there is a critical difference between allowing a State 'to protect her citizens from the operation of federal statutes' (which is what *Mellon* prohibits) and allowing a State to assert its rights under federal law (which it has standing to do)." *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007). Because Florida asserts several federal rights here—including the notice and comment and consultation guarantees—it has parens patriae standing. *See Texas v. United States*, 328 F. Supp. 3d 662, 697 (S.D. Tex. 2018); *Texas v. United States*, 2021 WL 3025857, at *14 (S.D. Tex. July 16, 2021); *Aziz v. Trump*, 231 F. Supp. 3d 23, 31–32 (E.D. Va. 2017).

injures those interests because it will likely cause healthcare employees to lose their jobs, *supra* at 5–6, exacerbating an already dire healthcare labor shortage, ECF No. 2-4 ¶ 12; ECF No. 2-2 ¶ 10; ECF No. 2-5 ¶ 9; ECF No. 2-6 ¶¶ 16, 31, and leaving Florida's citizens without access to vital medical care, ECF No. 2-3 ¶¶ 12, 14; *see also Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1236–37 (10th Cir. 2018) (patients suffered irreparable harm when facilities lost Medicaid funding). It will also force the States' healthcare employees to forfeit control of their private medical choices, personal information, and bodily autonomy to their employers and to the federal government.

## CONCLUSION

For the foregoing reasons, the Court should enjoin Defendants pending appeal from enforcing, implementing, or giving any effect to the mandate.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL

John Guard (FBN 374600)
CHIEF DEPUTY ATTORNEY GENERAL

James H. Percival (FBN 1016188)
DEPUTY ATTORNEY GENERAL OF LEGAL POLICY

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Daniel Bell (FBN 1008587)
CHIEF DEPUTY SOLICITOR GENERAL

*/s/ David M. Costello*
David M. Costello (FBN 1004952)
ASSISTANT SOLICITOR GENERAL

Natalie Christmas (FBN 1019180)
ASSISTANT ATTORNEY GENERAL OF LEGAL POLICY

Jason H. Hilborn (FBN 1008829)
DEPUTY SOLICITOR GENERAL

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
david.costello@myfloridalegal.com

*Counsel for the State of Florida*

## CERTIFICATE OF CONFERRAL

Consistent with Local Rule 7.1(B), counsel conferred with Defendants in good faith about the relief requested in this motion. Counsel is authorized to represent that Defendants oppose the relief requested.

## CERTIFICATE OF WORD COUNT

Consistent with Local Rule 7.1(F), this motion contains 3,420 words.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of November, 2021, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

<em>/s/ David M. Costello</em><br>
Assistant Solicitor General